# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | ) | |
| COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:10-cv-02755 |
| v. | ) | |
| | ) | Judge John A. Nordberg |
| SEVEN PALM INVESTMENTS, LLC, | ) | |
| PETER P. VEUGELER, | ) | |
| CARDIOVASCULAR SCIENCES, INC., | ) | |
| and LAWRENCE H. HOOPER, JR., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S MOTION AND MEMORANDUM OF LAW TO SET
DISGORGEMENT AND CIVIL PENALTY AMOUNTS AS TO
<u>DEFENDANTS PETER P. VEUGELER AND LAWRENCE H. HOOPER, JR.</u>**

James M. Carlson, Esq.
Senior Trial Counsel
Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Illinois Bar # 6269506
Tel.: (305) 982-6328
Fax: (305) 536-4154
E-mail:  CarlsonJa@sec.gov

*Lead Attorney for Plaintiff*
**SECURITIES AND EXCHANGE
COMMISSION**

Plaintiff Securities and Exchange Commission moves the Court for a final judgment against Defendant Peter P. Veugeler ordering him to pay: (1) disgorgement of $8,035,297; (2) prejudgment interest of $1,011,621; and (3) a civil penalty of $8,035,297, equivalent to his pecuniary gain. The Commission also moves the Court for a final judgment against Defendant Lawrence H. Hooper, Jr. ordering him to pay a civil penalty of $130,000. As detailed below, Veugeler, through his company Defendant Seven Palm Investments, LLC, orchestrated an elaborate pump-and-dump scheme involving two separate penny stocks. Veugeler was central to the scheme and committed a number of fraudulent acts, as well as engaging in manipulative trades, all resulting in his receipt of over $8 million in ill-gotten gains. Hooper, then the CEO of Defendant Cardiovascular Sciences, Inc., came to Veugeler looking for financing for his company, but ultimately worked with Veugeler to issue false and misleading press releases and other communications to investors regarding Cardiovascular. While Hooper did not receive any direct financial benefit, his acts ultimately assisted Veugeler with his schemes. As discussed below, the proposed relief is appropriate because of Veugeler and Hooper's respective involvement in the pump-and-dump scheme in this case, which involved the manipulation of two penny stocks, false and misleading press releases, and unregistered offerings.[1]

## I. FACTUAL AND PROCEDURAL HISTORY

### A. The Procedural History of the Case

On May 4, 2010, the Commission filed its Complaint seeking, among other things, permanent injunctions to prohibit violations by the Defendants of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a); and

---

[1] Concurrent with the filing of this motion, the Commission is also filing notices of voluntary dismissals of its disgorgement, prejudgment interest, and civil penalty claims against Defendants Seven Palm Investments, LLC and Cardiovascular Sciences, Inc. (D.E. ## 56, 57). Accordingly, once the Court rules on this motion, all outstanding issues will be resolved in this case.

Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and

Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. (Compl., D.E. # 1 at ¶ 6.)

Additionally, the Complaint seeks disgorgement, prejudgment interest, and a civil penalty

against Veugeler and a civil penalty against Hooper.

On January 9, 2012 and on March 9, 2011, the Court entered, by consent, Judgments of

Permanent Injunction and Other Relief against Veugeler and Hooper respectively, which

permanently enjoined them from violating Sections 5(a), 5(c), and 17(a) of the Securities Act and

Section 10(b) and Rule 10b-5 of the Exchange Act. (D.E. ## 33, 43.) The Judgments also

imposed permanent penny stock bars against Veugeler and Hooper. (*Id.*) The Judgments

provide in pertinent part for this motion:

> **IT IS FURTHER ORDERED AND ADJUDGED** that (Veugeler/Hooper) shall
> pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil
> penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and
> Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. ***The Court shall
> determine the amounts of the disgorgement and civil penalty upon motion of
> the Commission.*** Prejudgment interest shall be calculated from (September 28,
> 2009 for Veugeler / March 11, 2008 for Hooper) based on the rate of interest used
> by the Internal Revenue Service for the underpayment of federal income tax as set
> forth in 26 U.S.C. § 6621(a)(2). ***In connection with the Commission's motion
> for disgorgement and civil penalties, and at any hearing held on such a motion:
> (a) (Veugeler/Hooper) will be precluded from arguing that he did not violate the
> federal securities laws as alleged in the Complaint; (b) (Veugeler/Hooper) may
> not challenge the validity of the Consent or this Judgment; (c) solely for the
> purposes of such motion, the allegations of the Complaint shall be accepted as
> and deemed true by the Court*** …

(emphasis added) (D.E. # 33 at 4-5; # 43 at 4-5.) Accordingly, the Court should deem the

allegations in the Complaint true for the purposes of this motion.

## B. <u>Allegations of the Complaint Deemed True</u>

From October 2007 through September 2009, Veugeler, through his company, Seven

Palm, earned illicit profits of more than $8 million through the pump-and-dump of two penny

stocks, Cardiovascular and Emergent Health Corp. ("Emergent") (Compl., at ¶ 2.) During the fraud, Veugeler managed all of Seven Palm's affairs. (*Id*. at ¶ 8.) Seven Palm obtained nearly all of Cardiovascular and Emergent's purportedly unrestricted shares by offering financing to the companies. (*Id*. at ¶ 3.) In order to generate trading volume and increase both companies' stock prices, Veugeler entered into manipulative trades allowing Seven Palm to sell its holdings in both stocks at artificially inflated prices. (*Id*. at ¶ 5.) As part of the fraud, Hooper, Cardiovascular's president and CEO, prepared false and misleading press releases as well as other letters to investors on behalf of the company. (Compl., at ¶ 4.) Veugeler reviewed and discussed a number of the false press releases Hooper prepared and directed him to work with a third-party stock promoter to issue the press releases. (*Id*. at ¶ 5.)

### 1. *Cardiovascular Sciences, Inc.'s Fraudulent Offerings of Unregistered Shares*

In 2007, Hooper solicited Veugeler to provide financing for Cardiovascular. (Compl., at ¶ 17.) Through Seven Palm, Veugeler agreed to provide $1 million in exchange for 5 million shares of Cardiovascular. (*Id*.) The shares were to be issued to Seven Palm in two 2.5 million share tranches for $500,000 each. (*Id*.) No registration statement has ever been filed or in effect with the Commission in connection with the securities offered by Cardiovascular to Seven Palm, nor is any registration exemption applicable to these shares. (*Id*. at ¶ 18.) The subscription agreement for the first 2.5 million share tranche, dated October 2, 2007, stated Cardiovascular was conducting its offering (to Seven Palm) in reliance on an exemption, pursuant to Rule 504 of Regulation D and the Texas Securities Act. (*Id*. at ¶ 19.) In particular, the subscription agreement claimed an exemption to the requirement that all publicly traded shares be registered with the Commission. (*Id*.) In order to allow Cardiovascular to claim this exemption and Seven

Palm to receive the shares, Veugeler directed an attorney to issue an opinion letter to Hooper and Cardiovascular to instruct a transfer agent to issue the shares to Seven Palm. (*Id*. at ¶ 20.)

**The First Unregistered Cardiovascular Offering**

According to the attorney opinion letter, dated October 8, 2007, Cardiovascular purported to rely on the registration exemption set forth in Rule 504(b)(1)(iii) of Regulation D, which allows accredited investors to rely on a state law exemption. (Compl. at ¶ 21.) The letter also said Cardiovascular's offering to Seven Palm was relying on the Texas Securities Act. (*Id.*) The letter stated Seven Palm was "an entity residing and authorized to transact business within the state of Texas." (*Id.*) As Seven Palm's president, Veugeler knew this was false. (*Id.*) On the basis of this statement, the opinion letter claimed Cardiovascular could rely on Rule 109.4 of the Texas Administrative Code, an exemption for sales to certain institutional investors. (*Id.*) Cardiovascular's offering to Seven Palm, however, had no nexus to Texas. (*Id*. at ¶ 22.)

The opinion letter instructed Cardiovascular's transfer agent to issue unrestricted share certificates to Seven Palm, a Florida limited liability company doing business in Illinois. (Compl. at ¶ 22.) On October 8, 2007, Cardiovascular forwarded the attorney opinion letter to the transfer agent and instructed it to issue the first 2.5 million share tranche to Seven Palm. (*Id*. at ¶ 23.) Contrary to the express terms of the subscription agreement, Cardiovascular instructed the agent to issue the 2.5 million shares to Seven Palm even though Cardiovascular had not yet received "the total purchase price." (*Id*.) A draft Promissory Note dated October 9, 2007 gave Seven Palm 90 days, or until January 9, 2008, to make the $500,000 payment to Cardiovascular. (*Id*. at ¶ 24.) In reality, Veugeler and Seven Palm did not make any payments until February 22, 2008, when it transferred just $10,000 to Cardiovascular. (*Id.*) By March 14, 2008, Seven Palm had paid Cardiovascular only $95,000 for the shares. (*Id.*)

**The Second Unregistered Cardiovascular Offering**

Despite having received only $95,000 of the initial $500,000 owed under the share purchase agreement, Cardiovascular issued Seven Palm's second 2.5 million-share tranche on March 18, 2008. (Compl. at ¶ 25.)  Again, Seven Palm failed to pay for the shares upon their issuance.  (*Id.*)  On March 26, 2008, after having sold Cardiovascular's shares into the market, Seven Palm made one additional payment to Cardiovascular of $100,000.  (*Id.*)  Seven Palm never paid the remainder of the $1 million it had agreed to pay Cardiovascular. (*Id.*)

    2.  *Fraudulent Misrepresentations and Omissions Related to Cardiovascular's Offerings*

In connection with Cardiovascular's unregistered offerings, Veugeler and Hooper made numerous material misrepresentations and omissions regarding Seven Palm's funding of the company and Cardiovascular's operations.  Many of their public misrepresentations and omissions concerned Seven Palm providing funding to Cardiovascular.  (Compl., at ¶ 27.)  Veugeler devised a Cardiovascular promotional campaign to facilitate Seven Palm's liquidation of its Cardiovascular shares.  (*Id.*)  Veugeler, through Seven Palm, provided investor relations services to Cardiovascular, which included launching Cardiovascular's website and instructing Hooper to work with stock promoters.  (*Id.*)  Seven Palm paid for various Cardiovascular promotional activities, and even transferred shares to one promoter to hype the company. (*Id.*)

**Hooper's Involvement With Cardiovascular's Promotional Activities**

From October 2007 through February 2008, Cardiovascular issued a shareholder letter and press releases, and provided content for a newspaper article, falsely touting that Seven Palm had funded the company.  (Compl. at ¶ 28.)  Many of these communications discussed how Cardiovascular planned to use the money to fund its research and development, which the company touted as active and ongoing.  (*Id.*)  Hooper prepared and sent the shareholder letter,

approved all releases, and was quoted in the newspaper article. (*Id*. at ¶ 29.) These materials included statements that were false and misleading at the time he made them. (*Id*.) Hooper also worked with Veugeler in creating and contributing to these materials. He e-mailed Veugeler draft copies of shareholder letters and various releases, and Veugeler provided links to Cardiovascular news on at least one penny stock promotion website. (*Id*. at ¶ 30.) Hooper spoke with Veugeler to discuss the content of Cardiovascular's draft press releases. (*Id*.)

In particular, certain Cardiovascular shareholder letters contained misrepresentations and omissions. In an October 18, 2007 letter to shareholders, Hooper claimed Cardiovascular was moving forward with a 504 Regulation D offering that would allow it to raise up to $1 million. (Compl. at ¶ 31.) The letter went on to state "by the time you receive this letter, we expect to be receiving funds from this offering." (*Id*.) Hooper knew this statement was false because the draft promissory note provided that Seven Palm did not have to pay Cardiovascular until January. (*Id*. at ¶ 32.) On December 6, 2007, even though it had yet to receive any funding, Cardiovascular announced in a shareholder letter, drafted by Hooper, it was "just wrapping up" the Rule 504 Regulation D offering. (*Id*. at ¶ 33.) On December 12, 2007, still not having received a penny in funding, the company announced the funding event in a press release and a newspaper article titled "Cardiovascular Sciences get $1M capital investment." (*Id*. at ¶ 34.) In the article, Hooper provided the following quote: "The investment will allow the company to develop its products more rapidly and enter the marketplace within the next two years." (*Id*.)

The statements in the shareholder letter, the press release and the newspaper article were baseless and misleading because at the time Hooper made them, Seven Palm had not provided any funding to Cardiovascular. (Compl. at ¶ 35.) Seven Palm did not provide any funding to the company until it made a *de minimis* payment on February 22, 2008, and the next payment was

not until March 11, 2008. (*Id.*) Veugeler knew about these late payments as well as Seven Palm's failure to make full payment to the company. (*Id.*) In total, Cardiovascular netted only $140,000 of the $1 million funding it had publicly touted. (*Id.*)

Hooper also made public statements falsely asserting Seven Palm's funding to Cardiovascular allowed the company to further its research and development. For example, in a February 5, 2008 press release approved by Hooper, Cardiovascular announced:

> [F]ollowing the recent funding event, the Company has been able to reach an agreement with the University of Central Florida to continue the Company's research and development of its post-surgical anti-adhesion technology.

(Compl., ¶ 37.) Nine days later, another Cardiovascular press release reported:

> [T]he recent funding event, in association with its move into the next stage of development of its primary technology, actually represents a step ahead of where it planned to be. The Company is developing its technology with the University of Central Florida in Orlando.

(Compl., at ¶ 38.) Hooper also authorized a February 19, 2008 press release stating:

> The recent funding event announced with Seven Palm Investments, LLC now allows the company to intensify its efforts and move into high gear with its R&D.

(Compl. at ¶ 39.) Hooper had no basis to make any of these statements. (Compl. at ¶ 40.) In fact, at the time he made them, Cardiovascular had not received any funding from Seven Palm, much less sufficient funding to renew any collaboration with the university. (*Id.* at ¶ 41.) Further, Cardiovascular had not reached any agreement with the university to develop its technology, and it was not conducting any active research and development at the time. (*Id.*) Moreover, Veugeler also knew that without any funding from Seven Palm, Cardiovascular and Hooper were incapable of proceeding with the developments touted in the press releases. (*Id.*)

### *3. Veugeler's Manipulative Trading in Cardiovascular*

In addition to devising the Cardiovascular promotional campaign, Seven Palm, through Veugeler, engaged in manipulative practices aimed at misleading the market to increase and maintain artificially high prices so Veugeler could resell Seven Palm's Cardiovascular holdings for substantial gains. In particular, Veugeler traded Cardiovascular shares in Seven Palm accounts at several broker-dealers to falsely create the impression that Cardiovascular's stock was liquid and active. (Compl. at ¶ 42.) He sold the majority of his shares as Cardiovascular issued positive press releases. (*Id*.) Specifically, Veugeler used Seven Palm's accounts at multiple broker-dealers to place numerous buy orders for small amounts of Cardiovascular stock at prices that equaled or exceeded the highest bid price posted by market makers. (Compl. at ¶ 43.) This had two consequences. First, when there was increased selling in the market by other market participants, Veugeler's supporting buy orders absorbed some of the sell orders so the stock price would not fall dramatically (essentially creating artificial floor prices for the stock). (*Id*.) Second, by placing supporting buy orders through different brokerage firms, Veugeler created a façade that market makers were posting a substantial number of bids. (*Id*.) This gave a false sense of investor demand. (*Id*.)

For example, in December 2007, Veugeler repeatedly entered buy and sell orders in Cardiovascular stock at the same price or lower within minutes of each other in two different accounts. (Compl. at ¶ 44.) In one instance, Veugeler purchased shares at $0.40, sold at $0.26, and then bought again at $0.40 within a short period of time. (*Id*.) At the height of his activity, there were numerous instances of Veugeler being on the inside bid, and even entering buy orders at increasing prices and then cancelling them. (*Id*. at ¶ 45.) Veugeler also entered buy orders with a limit price exceeding the existing inside bid, and subsequently canceled those orders prior

to execution. (*Id.*) This manipulative tactic gave the appearance of an active market with high demand for Cardiovascular stock, causing its share price to increase. (*Id.*)

Cardiovascular's promotional activity and Veugeler's manipulation caused the company's stock price and volume to increase markedly. (Compl. at ¶ 46.) From August 22 through October 12, 2007 (the first day Veugeler executed a trade in the stock), Cardiovascular shares were dormant and traded on only two days. (*Id.*) As Veugeler implemented his manipulative tactics, Cardiovascular's share price steadily increased, peaking at $2.70 on March 11, 2008 on volume of 1,530,417 shares. (*Id.*) This compared to Cardiovascular's average daily trading volume of 32,306 for the prior six months. (Compl. at ¶ 46.) As a result of this manipulative scheme, Veugeler sold his stock at an artificially inflated price, and he realized more than $4.6 million in illicit profits. (*Id*. at ¶ 47.) After his manipulation, the stock became almost worthless when it dipped below $1.00 by the end of April 2008. (*Id*. at ¶ 48.)

### *4. Emergent's Fraudulent Offering of Unregistered Shares*

In addition to the Cardiovascular scheme, Veugeler and Seven Palm also participated in a fraudulent offering involving Emergent. In July 2008, Emergent's CEO contacted Veugeler seeking financing. (Compl. at ¶ 50.) Through Seven Palm, Veugeler agreed to provide $240,000 for 1.6 million Emergent shares, which represented more than 96% of Emergent's outstanding, purportedly unrestricted shares. (*Id*. at ¶ 51.) Veugeler directed the same attorney who issued the opinion letter to Cardiovascular to issue an opinion letter to Emergent to be used to instruct the transfer agent to issue shares to Seven Palm. (*Id*. at ¶ 52.)

In August 2008, Emergent forwarded the attorney opinion letter to its transfer agent and instructed it to issue the 1.6 million shares to Seven Palm. (Compl. at ¶ 52.) The opinion letter used the same fraudulent tactics used in Cardiovascular's offerings. In particular, the letter

contained the following statements: (1) Emergent purported to rely on the registration exemption set forth in Rule 504(b)(1)(iii) of Regulation D, which allows accredited investors to rely on a state law exemption; (2) Emergent's offering to Seven Palm was relying on the Texas Securities Act; and (3) Seven Palm was "an entity residing and authorized to transact business within the state of Texas. (*Id*. at ¶ 53.) As stated above, Veugeler knew Seven Palm was not an entity residing and authorized to transact business within the state of Texas. (*Id.*)

On the basis of Veugeler's direction, the opinion letter claimed Emergent could rely on Rule 109.4 of the Texas Administrative Code, an exemption for sales to certain institutional investors. (Compl. at ¶ 53.) As with Cardiovascular's offerings, however, Emergent's offering to Seven Palm had no nexus to Texas. (*Id*. at ¶ 54.) The attorney letter instructed Emergent's transfer agent to issue legend-free share certificates to Veugeler's company, Seven Palm. (*Id.*) No registration statement had been filed or was in effect with the Commission in connection with the securities Emergent offered to Seven Palm, nor was any registration exemption applicable to these shares. (*Id*. at ¶ 55.) Just as Cardiovascular did, Emergent issued the shares to Seven Palm without receiving any payment. (*Id*. at ¶ 56.)

On September 30, 2008, Seven Palm executed a promissory note to pay for the shares on or before June 30, 2009. (Compl. at ¶ 56.) Seven Palm, however, failed to make any payment by that date. (*Id.*) In July and August 2009, Seven Palm made two payments to Emergent totaling $50,000. (*Id*. at ¶ 57.) After earning illicit profits from trading Emergent's stock in September 2009, Seven Palm paid Emergent the $190,000 balance. (*Id*.)

### 5. Veugeler's Manipulative Trading in Emergent

Beginning in August 2008, Seven Palm, through Veugeler, applied similar manipulative practices in trading Emergent as it did with Cardiovascular's stock. Veugeler entered Emergent

transactions through multiple Seven Palm brokerage accounts to falsely create the impression that Emergent's stock was liquid and active. (Compl. at ¶ 58.) He also placed numerous orders for small amounts of Emergent stock at prices that equaled or exceeded the highest bid price posted by market makers. (*Id.*) Veugeler entered buy and sell orders at the same price within minutes of each other in two different accounts. (*Id*. at ¶ 59.) He also entered buy orders at increasing prices, only to cancel them. (*Id*.) Veugeler was active on both sides of the market, contributing more than 50% of the reported trading volume for Emergent over a number of days. (*Id*. at ¶ 60.) His trading included numerous wash trades. (*Id.*)

Veugeler's manipulation caused the company's stock price and volume to increase markedly. (Compl. at ¶ 61.) Four months after Emergent issued shares to Seven Palm, Emergent's share price climbed from $0.35 to $1.25 on November 24, 2008. (*Id.*) Between August 2008 and January 2009, Seven Palm sold more than 350,000 Emergent shares into the market. (*Id.*) From January 2009 through September 21, 2009, Emergent's stock remained largely inactive. (*Id*. at ¶ 62.) From September 21 through September 28, Seven Palm dumped an additional 1,148,367 Emergent shares into the market. (*Id.*) Seven Palm used similar deceptive trading practices that it employed in both the Cardiovascular manipulation and its earlier Emergent trading, including trading in two separate brokerage accounts, buying a small number of Emergent shares to bid up the share price before dumping its holdings. (Compl. at ¶ 63.) In total, Veugeler earned more than $3.4 million in illicit profits from his sale of Emergent's securities. (Compl. at ¶ 64.)

## II. ARGUMENT

### A.  The Court Should Order Veugeler to
### Pay Disgorgement and Prejudgment Interest

Disgorgement and prejudgment interest are equitable remedies designed to deprive a wrongdoer of unjust enrichment and also to deter others.  *SEC v. Black*, No. 04-c-7377, 2009 WL 1181480 at * 2 (N.D. Ill. April 30, 2009) (Hart, J.) (citations omitted); *see also SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989); *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985); *SEC v. Manor Nursing Centers*, 458 F.2d 1082, 1103-1104 (2d Cir. 1972) ("The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable").  The district court has broad discretion in determining whether to award disgorgement and in setting the amount.  *SEC v. Alanar, Inc.*, No. 05-cv-1102, 2008 WL 1994854 at *4 (S.D. Ind. May 6, 2008); *SEC v. Michel*, 521 F. Supp. 2d 795, 830 (N.D. Ill. 2007); *SEC v. Collins*, No. 01-C-3085, 2003 WL 21196236 at *5 (N.D. Ill. May 21, 2003). When seeking disgorgement, the SEC is required to show that the amount of disgorgement is a "reasonable approximation" of the profits the defendant reaped from the wrongful conduct.  *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1231 (D.C. Cir. 1989); *SEC v. Randy,* 38 F. Supp. 2d 657, 673–74 (N.D.Ill.1999).  The burden then shifts to the defendants to demonstrate that the SEC's approximation is inaccurate.  *First City Fin. Corp.,* 890 F.2d at 1232; *Randy,* 38 F. Supp. 2d at 674.  Any ambiguity in the calculation should be resolved against the defrauding parties.  *Black*, 2009 WL 1181480 at * 2.  (citations omitted).

In making its showing of a reasonable approximation, the Commission must sufficiently show that amount is causally related to the violation.  *Michel,* F. Supp. 2d at 630–31 (quoting *First City,* 890 F.2d at 1231) ("amount of disgorgement 'need only be a reasonable approximation of profits causally connected to the violation'"); *SEC v. Homa,* No. 99-C-6895,

2004 WL 1474580 *1 (N.D. Ill. June 28, 2004) (same). With regard to disgorgement amounts, this Court has noted the Commission need not trace every dollar of a defendant's ill-gotten gains, and where the defendants have commingled the money, the Commission is not required to trace the misappropriated money. *Black*, 2009 WL 1181480 at * 3. (citations omitted). Since calculating exact disgorgement may at times be a near-impossible task, the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty. *First City Fin. Corp.,* 890 F.2d at 1232.

### 1. The Court Should Order Veugeler to Pay $8,035,297 in Disgorgement

In this case, it is appropriate for the Court to order Veugeler to pay disgorgement of $8,035,297, which is equal to the amount of his ill-gotten gains in this case. The calculation of Veugeler's disgorgement is based on: (1) his receipt and purchase of Cardiovascular and Emergent stock during the time period of the fraud; and (2) his sale of these shares and the gains he received as a result.

With regard to Cardiovascular stock, the below table charts Veugeler's activity during the time frame of the fraud:

| Net Transfer of Cardiovascular Shares into Veugeler Controlled Brokerage Accounts | Additional Cardiovascular Shares Purchased By Veugeler Controlled Brokerage Accounts | Number of Cardiovascular Shares Sold By Veugeler Controlled Brokerage Accounts | Gains |
|---|---|---|---|
| 4,687,500 | 2,614,178 | 6,449,073 | $4,616,827 |

(Declaration of T. Galdencio, attached as Exhibit A at ¶ 4(c)). Veugeler received almost five million shares as part of his "financing" arrangement with Cardiovascular. (*Id.* at ¶ 4(c)(1).) During the time period of his manipulation, Veugeler purchased an additional 2.6 million shares of Cardiovascular stock. (*Id.* at ¶ 4(c)(2).) Ultimately, benefitting from artificially inflated stock

prices as a result of his fraud, Veugeler sold nearly 6.5 million of his shares realizing gains of approximately $4,616,827 from his Cardiovascular trading.  (*Id*. at ¶ 4(c)(3)-(4).)

With regard to Emergent stock, the below table charts Veugeler's activity during the fraud:

| Net Transfer of Emergent Shares into Veugeler Controlled Brokerage Accounts | Additional Emergent Shares Purchased By Veugeler Controlled Brokerage Accounts | Number of Emergent Shares Sold By Veugeler Controlled Brokerage Accounts | Gains |
|---|---|---|---|
| 1,480,000 | 293,545 | 1,679,485 | $3,418,470 |

(Galdencio Dec., Ex. A at ¶ 4(b).)  Veugeler received almost 1.5 million shares as part of his "financing" arrangement with Emergent.  (*Id*. at ¶ 4(b)(1).)  During the manipulation, Veugeler purchased an additional 293,545 shares of Emergent stock.  (*Id*. at ¶ 4(b)(2).)  Ultimately, benefitting from artificially inflated stock prices as a result of his fraud, Veugeler sold nearly 1.7 million of his shares and realized gains of approximately $3,418,470 from his trading in Emergent stock.  (*Id*. at ¶ 4(c)(3)-(4).)

In total, Veugeler received $8,035,297 in ill-gotten gains based on his receipt, purchase, and subsequent sale of Cardiovascular and Emergent shares while participating in a market manipulation scheme involving the two companies as detailed above in Section (I)(B). (Galdencio Dec., Ex. A at ¶ 4(b)-(c).)  This total reflects gains from a multitude of trades orchestrated by Veugeler during the time of the fraud from the following trading accounts he controlled:  (1) a Charles Schwab account ending in 3144; (2) an OptionsXpress account ending in 4208; (3) a TD Ameritrade account ending in 2932; and (4) a Scottrade account ending in 7006.  (Galdencio Dec., Ex. A at ¶ 4(b)(2).)  The trades summarized and totaled in Mr. Galdencio's declaration and this motion are reflected in the statements for these accounts and are attached as exhibits to his declaration.  (*Id*.)

## 2. The Court Should Order Veugeler to Pay $1,011,621 in Pre-Judgment Interest

To prevent fraudsters from profiting from their illegal activities, courts routinely require defendants to pay prejudgment interest on disgorgement. *See, e.g., SEC v. Lipson*, 129 F. Supp. 2d 1148 (N.D. Ill. 2001), *aff'd*, 278 F.3d 656 (7th Cir. 2002); *Randy*, 38 F. Supp. 2d at 674; *SEC v. Jakubowski*, No. 94 C 4539, 1997 WL 598108 at *1 (N.D. Ill. Sept. 19, 1997). "This 'prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity.'" *Jakubowski*, 1997 WL 598108 at *2 (quoting *SEC v. Moran et al.,* 944 F. Supp. 286, 295 (S.D.N.Y. 1996)). Prejudgment interest is generally calculated according to the underpayment rate published by the IRS, which courts typically use in connection with disgorgement in Commission cases. *See, e.g., SEC* v. *Koenig,* 532 F. Supp. 2d 987, 995 (N.D. Ill. 2007); *Randy*, 38 F. Supp at 674; *Jakubowski*, 1997 WL 598108 at *2. Here, the prejudgment interest figures were calculated in accordance with the delinquent tax rate established by the IRS, 26 U.S.C. § 6621(a)(2), and assessed on a quarterly basis, from the date of Veugeler's last receipt of ill-gotten gains to the date of the previous motion. As of April 19, 2013, based on a disgorgement amount of $8,035,297, prejudgment interest amounts to $$1,011,621. (Galdencio Dec., Ex. A at ¶ 4(b)-(c).)

## B. The Court Should Order Veugeler and Hooper to Pay Civil Penalties

The Commission seeks a third tier civil penalty of $8,035,297 against Veugeler, equal to his ill-gotten gains, and a statutory, third-tier penalty of $130,000 against Hooper. The Commission seeks these penalties pursuant to Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act, each of which establishes the same three tiers of penalties. Under the First Tier for both statutes, the Court may impose a penalty of up to (i) $6,500 on a natural person for each violation or (ii) the gross amount of pecuniary gain to the defendant as a result of

the violation. Under the Second Tier, the Court may impose a penalty of up to (i) $65,000 on a natural person for each violation or (ii) the gross amount of pecuniary gain to the defendant as a result of the violation. The Second Tier applies where the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement. Finally, under the Third Tier the Court may impose a penalty of up to (i) $130,000 on an entity for each violation or (ii) the gross amount of pecuniary gain to the defendant as a result of the violation.[2]

In this case, a third-tier penalty, equal to the amount of his gross pecuniary is appropriate against Veugeler. Third-tier penalties may be applied if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2)(C), 73u(d)(3)(B)(iii); *Alanar,* 2008 WL 199854 at *6; *Church Extension,* 429 F.Supp.2d at 1050. The imposition of a penalty is a discretionary determination to be made in light of the particular facts and circumstances of the case. 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B); *SEC v. Daly,* 572 F. Supp. 2d 129, 134 (D.D.C.2008); *SEC v. Opulentica, LLC,* 479 F. Supp. 2d 319, 331 (S.D.N.Y.2007). In imposing a penalty, the Court may consider the following factors:

> (1) the egregiousness of the violations; (2) defendant's intent; (3) whether the violations were recurring; (4) whether defendant has admitted wrongdoing; (5) the losses or risks of losses caused by the conduct; (6) any cooperation provided to enforcement authorities, and (7) the imposition of other remedies or penalties.

*Alanar,* 2008 WL 199854 at *7; *Church Extension,* 429 F. Supp. 2d at 1050–51. While these factors are helpful in characterizing a particular defendant's actions, the civil penalty framework

---

[2] Under the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, these amounts were adjusted to account for inflation, based on violation dates. 17 C.F.R. §§ 201.1001-1004, Tbl. II-IV to Subpt. E. The amounts here were in effect from February 2005 to March 2009. These adjusted rates apply to this case because Veugeler's fraudulent conduct began in October 2007. *See* 17 C.F.R. § 201.1003, Tbl. IV to Subpt.

is of a "discretionary nature" and each case "has its own particular facts and circumstances which determine the appropriate penalty to be imposed." *Moran,* 944 F. Supp. at 296-97.

### 1. *The Facts Support a $8,035,297 Civil Penalty as to Veugeler*

Veugeler's actions merit an $8,035,297 civil penalty. <u>First</u>, his actions were clearly egregious. For almost two years, he orchestrated pump-and-dump and conducted manipulative trading involving the two companies designed to falsely raise their stock price and volume in an effort to falsely generate investor interest in them. (Compl., at ¶¶ 1, 5.) In both schemes, Veugeler was the central player, planning and executing them. Not only did Veugeler devise the Cardiovascular promotional campaign, he also engaged in manipulative trading of both stocks. (*Id*. at ¶ 27, 41-48, 58-64.) Moreover, his fraudulent actions brought him an enormous amount of ill-gotten gains. In fact, he ultimately earned illicit profits of more than $8 million through his actions. (Id. at ¶ 2.)

<u>Second</u>, Veugeler displayed a high level of scienter by, among other things, relying on registration exemptions he knew did not apply to the respective offerings. (Compl. at ¶¶ 19-22, 53-55.) Even though Veugeler knew the offerings did not qualify for the exemptions, he ordered the respective transfer agents to issue the shares. (*Id*. at ¶¶ 20, 53-55.) Additionally, his manipulative trading also demonstrates a high degree of scienter. (*Id*. at ¶ 27, 41-48, 58-64.) For example, many of his trades were made solely to give the false appearance of an active market for the company and were timed with the issuance of false press releases. (*Id*. at ¶¶ 45-47.) Moreover, his promises of "financing" to both Cardiovascular and Emergent never came true. (*Id*. at ¶¶ 25, 57.)

<u>Third</u>, Veugeler's violations were recurring from October 2007 through September 2009 involving two different companies and at least three unregistered offerings. (Compl., at ¶ 2.)

His practice of entering into manipulative trades in both stocks ran for several months. (*Id*. at ¶¶ 42-47, 58-60.) None of Veugeler's violations represented isolated instances of conduct.

Fourth, as for the factors of cooperation and admission of guilt, while Veugeler has entered into a consent agreement in this case, he has not admitted to receiving the vast amount of ill-gotten gains he received in this case. Additionally, Veugeler has not particularly assisted or cooperated with the Commission during this case.

Finally, the Court should take into account Veugeler's massive ill-gotten gains in this case. As detailed above, Veugeler received $8,035,297 because of his actions – including the unregistered offerings and the manipulative trading he orchestrated and helped execute. (Compl. at ¶¶ 47, 64.) As to the presence of other sanctions, there is currently no other proceeding where Veugeler can be held responsible for his actions as detailed in this case. While the Court has already entered a judgment enjoining him from violating the federal securities laws as well as entering a penny stock bar, there has been monetary relief granted as of yet. (D.E. # 43.) Based on his egregious, intricate, and long running actions as detailed above, the Court should impose a civil penalty of $8,035,297 against Veugeler.

## 2. *The Facts Support a $140,000 Civil Penalty as to Hooper*

Hooper's actions merit a one-time statutory third-tier $130,000 penalty. First, Hooper's actions were egregious in this case. He participated in a pump-and-dump scheme involving his company, Cardiovascular by, among other things, issuing false press releases and shareholder letters containing numerous misrepresentations about his Company. (Compl. at ¶¶ 28-35.) Moreover, Hooper's actions spanned two separate offerings and were designed to falsely raise the company's stock price and volume in an effort to generate investor interest. (*Id*. at ¶ 17-25.) Second, Hooper's scienter is reflected in his knowledge of the false statements in his press

releases and shareholder letters. In particular, he prepared and sent a shareholder letter and approved press releases containing representations he knew were untrue. (Compl. at ¶ 35.) For example, Hooper approved a press release touting financing from Seven Palm and announcing Cardiovascular's research and development efforts with University of Central Florida. (*Id*. at ¶¶ 37-39.) At the time he made these statements, Hooper knew none of them were true. (*Id*. at ¶¶ 40-41.)

Third, while Hooper's involvement spanned two offerings, his involvement was limited to Cardiovascular's offerings. As such, his actions are more limited and less recurring than Veugeler's. Fourth, Hooper has consented to entry of a permanent injunction and other relief in this case, and he has assisted the Commission throughout the litigation. (D.E. # 33.) Fifth, Hooper did not directly receive any benefit or ill-gotten gains because of the actions in the Complaint. Lastly, the Commission believes that with the permanent injunction and penny stock bar already in place against him, the proposed civil penalty of $130,000 appropriately punishes Hooper for his involvement in the scheme. (D.E. # 33.)

While the Commission could have sought a much larger penalty against, there are factors that instead weigh in favor of a penalty of $130,000. Primarily, Hooper's actions do not appear to demonstrate a recurring pattern of violating the securities laws. His involvement in the pump-and-dump schemes appears to be a relatively isolated incident. Moreover, there is no indication he knew about Veugeler's involvement in falsely claiming the registration exemption. Additionally, Hooper received relatively little benefit from his involvement in this case. Ultimately, his company netted only $140,000 of the $1 million Veugeler promised, and Hooper did not personally receive any ill-gotten gains. Here, a penalty of $130,000 will sufficiently punish Hooper and deter him from future wrong doing.

## III.  CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court grant the Commission's Motion to Set Civil Penalty and Disgorgement Amounts and order Peter P. Veugeler to pay: (1) disgorgement of $8,035,297, (2) prejudgment interest of $1,011,621; and (3) a civil penalty in the amount of $8,035,297.  The Commission also respectfully requests this Court to order Lawrence H. Hooper, Jr. to pay a civil penalty of $130,000.

Respectfully Submitted,


April 24, 2013                                   /s James M. Carlson_____

James M. Carlson, Esq.
Senior Trial Counsel
Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Illinois Bar # 6269506
Tel.: (305) 982-6328 / Fax: (305) 536-4154
E-mail:  CarlsonJa@sec.gov

*Lead Attorney for Plaintiff*
**SECURITIES AND EXCHANGE COMMISSION**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 24, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  Pursuant to Local Rule 5.2(e), a paper copy will be provided to chambers by April 25, 2013.

I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Andrew S. May
May Law, PC
3700 W. Devon Ave., Ste. E
Lincolnwood, IL 60712
E-mail:  Amay@maylawpc.net
*Attorney for Defendants Peter Veugeler and Seven Palm Investments, LLC*

Lawrence H. Hooper, Jr.
14613 Forrest Hill Drive
Monmouth, OR 97361-9415
Telephone: (407) 247-4399
E-mail: Larry@cvsciences.org
*Pro Se*

Lawrence H. Hooper, Jr., MD
CEO Cardiovascular Sciences, Inc.
3251 Progress Dr., #A107
Orlando, FL 32826
*CEO of Cardiovascular Sciences, Inc.*

/s James M. Carlson
James M. Carlson